UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

      Plaintiff,

      v.

COSTCO WHOLESALE
CORPORATION,

      Defendant.

CASE NO. C07-1499RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on cross-motions for summary judgment (Dkt. ## 52, 53).  Plaintiff Liberty Mutual Fire Insurance Company ("Liberty") requested oral argument; Defendant Costco Wholesale Corporation ("Costco") did not.  The court finds oral argument unnecessary.  For the reasons stated herein, the court DENIES both motions.  In accordance with the court's July 2, 2008 order (Dkt. # 44) granting the parties' request for bifurcated trials, the court sets a June 22, 2009 date for the beginning of a trial to determine whether Costco timely sued.

## II.  BACKGROUND

Liberty issued an insurance policy (the "Policy") to Costco that was effective from June 1997 to June 1998.  With narrow exceptions that do not apply here, the Policy provided excess insurance only.  For "loss or damage arising from any one loss or

ORDER – 1

disaster," the Policy covered only loss or damage in excess of $20 million, up to a maximum of $5 million in total liability. Policy at 18 ¶ 7.[1]

The Policy was part of a multi-layered insurance program in which at least six other insurers participated. Swiss Re covered 15% of all losses in excess of Costco's $100,000 self-insured retention, up to a program-wide limit of $150 million per loss. Two insurers, Commonwealth and Zurich-American, split the remaining $17 million for coverage for losses less than $20 million above Costco's self-insured retention. Liberty shared the layer between $20 million and $25 million with Swiss Re, fixing its maximum per-loss liability at $4.25 million (85% of $5 million). J&H Marsh & McLennan, Inc. ("Marsh") brokered the insurance program for Costco, and also served as the agent to which Costco would provide notice of any loss for which it sought coverage under the program. Policy at 31 ¶ 42.

In October 1997, Costco discovered that a newly manufactured warehouse in New Rochelle, New York, was sinking into the ground. Costco quickly began efforts to assess and remedy the damage. Costco notified Marsh as soon as it discovered the damage, and it is undisputed that Liberty received notice from Marsh in June 1998.

The three insurers who shared liability for the first layer in the program (Swiss Re, Zurich-American, and Commonwealth) denied coverage for the warehouse loss. Costco sued all three in October 1998. Liberty was neither named in the suit nor notified about the suit. Indeed, there is no evidence that Liberty responded in 1998 to the notice of the warehouse loss. Costco's suit against its primary insurers wended its way from King County Superior Court to this District to the Ninth Circuit. In 2002, the Ninth Circuit affirmed a judgment that all three insurers were liable for the loss and for prospective damages arising from the loss up to the limits of their policies. *Costco Wholesale Corp.*

---

[1] The parties have submitted many copies of the Policy over the course of the litigation, each with its own page numbering. To avoid confusion when citing the Policy, the court cites the page number at the center of the bottom margin of each page of the Policy, along with a paragraph number.

ORDER – 2

*v. Commonwealth Ins. Co.*, 45 Fed. Appx. 646 (9th Cir. 2002); *see also* Case No. C98-1454JCC, Dkt. # 232 (May 1, 2001 order setting terms of declaratory judgment).

Costco's efforts to remedy the damage to the warehouse have been ongoing for more than 10 years. The parties dispute how Costco's knowledge about the extent of its losses evolved over those ten years. The court will address those disputes in greater detail in Part III.B, *infra*. For now, it suffices to note that the evidence establishes, at a minimum, that Costco's costs to repair the damage to the warehouse increased over time, as did estimates about what it would ultimately cost to complete the repairs. Costco insists that it did not know until July 2006 that its costs for remedying the damage to the warehouse would exceed $20 million. Liberty insists that Costco knew as early as 1997 that its costs could exceed $20 million, and that Costco's certainty that the costs would exceed $20 million increased steadily over time. For example, Liberty contends that a 2003 damage estimate gave Costco certainty that damages would exceed $20 million.

These disputes matter because of the Policy's two-year suit limitation clause ("Limitation Clause") which states as follows:

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless . . . commenced within twenty-four (24) months next after inception of the loss, unless a longer period of time is provide by applicable statute.

Policy at 31 ¶ 43. It is undisputed that no suit arising out of Costco's claim against Liberty arose until July 10, 2006, when Liberty sued for declaratory judgment that it owed Costco nothing. Costco filed a counterclaim on September 7, 2006, and for purposes of assessing the Limitation Clause, Washington law treats the counterclaim as a suit filed on July 10, 2006, the date Liberty sued. *Logan v. North-West Ins. Co.*, 724 P.2d 1059, 1061-62 (Wash. Ct. App. 2006). Costco's suit is therefore timely only if the "inception of the loss" for which it claims coverage was on or after June 10, 2004.

In a March 4, 2008 order (Dkt. # 40) resolving Liberty's motion for judgment on the pleadings, the court partially construed the Limitation Clause. It rejected Liberty's

ORDER – 3

view that the Clause required Costco to sue by October 1999, two years after it first discovered damage to the warehouse. The court concluded that the phrase "next after inception of the loss" in the Clause meant "after inception of a loss compensable under the Policy." *Id.* at 7. At the same time, the court declined to decide when the "inception of a loss compensable under the Policy" occurred, ruling only that Costco's allegation that it had no loss compensable under the Policy in October 1997 meant that the "inception of the loss" was after October 1997, and Costco was not obligated to sue by October 1999. *Id.*

The parties have now filed cross-motions for summary judgment that they hope will resolve whether Costco timely sued. Liberty argues that the undisputed evidence establishes as a matter of law that Costco was obligated to sue more than two years before July 2006. Costco disagrees, asserting that it was not obliged to sue until its actual losses from the warehouse exceeded $20 million, and that it sued within two years of that time as a matter of law. It also argues that its suit against Swiss Re, Commonwealth, and Zurich-American satisfies its Limitation Clause obligations to Liberty. The court now turns to the parties' contentions.

## III. ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The

ORDER – 4

court defers to neither party in answering legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.  The Limitation Clause Requires a Suit Within Two Years After Costco's Risk Manager First Has Knowledge of a Loss in Excess of $20 Million.**

The question now before the court is the one the court declined to answer in its prior order:  when does the inception of a loss under the Policy occur such that the Policy's two-year period for filing suit begins?  This question has two components.  The first is a purely legal question of policy interpretation:  what circumstances trigger the beginning of the limitations period?  The second is a factual question that the court will reach in Part III.B, *infra*:  does either party demonstrate that the evidence leaves no dispute as to whether the Policy obligated Costco to sue sooner than it did?

**1.  The Court Applies the Standard Rules of Policy Interpretation, Except that It Declines to Construe Ambiguous Terms Against Liberty.**

As the court stated in its prior order, insurance policy interpretation in Washington is a purely legal question.  *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002).  The court must give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance."  *Id*. (internal quotation omitted).  The court must construe the entire policy as a whole "so as to give force and effect to each clause."  *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990).  Terms defined within a policy are to be construed as defined, while undefined terms are typically given their ordinary meaning.  *Id.* at 511.  The court must use a term's plain meaning "unless it is apparent from a reading of the whole instrument that a different or special meaning was intended."  *Stoughton v. Mutual of Enumclaw*, 810 P.2d 80, 82 (Wash. Ct. App. 1991) (quoting *Lawrence v. Northwest Cas. Co.*, 311 P.2d 670, 672 (Wash. 1957)).

Ordinarily, where a reading of the whole policy reveals that a policy term is susceptible to two or more different, yet reasonable, interpretations, the court chooses the interpretation that favors the insured.  *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246

ORDER – 5

(Wash. 1997) (cited in *Petersen-Gonzales v. Garcia*, 86 P.3d 210 (2004)); *Allstate Ins. Co. v. Hammonds*, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading the contract as a whole, two reasonable and fair interpretations are possible."). This principle, however, arises from the common law rule that a court must construe an ambiguous contract term against its drafter. *See, e.g.*, *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000) (stating that ambiguities are resolved "against the drafter-insurer"); *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) (assuming that the insurer drafts the policy).

Because Costco had at least some role in drafting the Policy, it is unclear whether it is appropriate to construe ambiguous terms against Liberty. Marsh prepared the Policy on Costco's behalf, believing that this would result in "broader coverage" than Costco would obtain with a typical insurer-issued policy. Catenacci Decl. (Dkt. # 58-2), Ex. K (S. Madison Depo. at 22:1-12). Evidence indicates that Marsh negotiated with Liberty for changes in some Policy terms. *Id.*, Ex. L. The evidence also shows, however, that many of the Policy terms are materially indistinguishable from standard clauses that Liberty and other insurers have drafted. The Limitation Clause, for example, is a carbon copy of insurer-drafted clauses that appear in reported cases across the nation. Ultimately, although the evidence reveals that Costco had more input into the language of the Policy than the typical insured, the evidence reveals little or nothing about who is responsible for the specific Policy clauses and terms that give rise to the parties' disputes.[2] Absent such evidence, the court declines to presume that either Costco or Liberty drafted the clauses in dispute. This is ultimately of no consequence, because the court finds that the Policy itself provides sufficient information to resolve any ambiguities in the disputed clauses.

---

[2] To the extent Liberty suggests that the court should not construe the Policy in Costco's favor merely because a large corporation like Costco has sufficient power to bargain for a favorable policy, it is mistaken. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 514 (Wash. 1990) (declining to adopt different rules of policy interpretation for "corporate giant" insureds).

ORDER – 6

## 2. The Term "Inception of the Loss" in the Limitation Clause Means the First Knowledge of a Loss in Excess of $20 Million.

The court already construed the phrase "after inception of the loss" in the Limitation Clause to mean "after inception of a loss compensable under the Policy." This was sufficient to reject Liberty's contention that the "inception of the loss" commencing the two-year limitations period is invariably the beginning of the physical loss, or in this case the October 1997 damage to Costco's warehouse. The court did not, however, further construe "inception." The court will do so now by first elaborating on its prior holding. The court begins, as it must, with the language of the Policy.

The Policy language dictates that the court cannot interpret the Limitation Clause to permit the limitations period to expire before the insured has a "claim." The Limitation Clause by its terms only applies to a "suit or action on this policy for the recovery of any *claim*." Policy at 31 ¶ 43 (emphasis added). The Policy uses "claim" to refer to the insured's demand for particular compensation under the Policy. *See*, *e.g.*, Policy at 18-19 ¶ 8, 33 ¶¶ 48-49. Thus, the Limitation Clause assumes that by the time the two-year period has run, the insured will have a "claim" on which it can sue. This is not only consistent with the Policy's language, it is consistent with Washington law. In *Simms v. Allstate Ins. Co.*, 621 P.2d 155, 158 (Wash. Ct. App. 1980), the court construed an identical limitation clause and held that the term "'on this policy for the recovery of any claim' means claims compensable under the [insurance] contract."[3]

The Policy also establishes, however, that a claim for which the insured would sue does not arise without a series of communications between the insurer and the insured. The first of these communications is the insured's notice that it has a claim for

---

[3] The *Simms* court reached this holding while addressing a question not germane to this case: whether a policy's limitation period is applicable to suits asserting statutory violations arising out of the relationship between the insurer and the insured. 621 P.2d at 158. The *Simms* court's construction of the limitation clause, however, did not depend on that question, but rather on the plain language of the clause. *Id.* (citing *Murphy v. Allstate Ins. Co.*, 147 Cal. Rptr. 565, 571 (Cal. Ct. App. 1978)).

ORDER – 7

compensation under the Policy. The Policy describes the insured's obligation to give notice:

> It is agreed that as soon as practicable after the Risk Manager of the Insured has knowledge of a loss insured by this policy, a report thereof shall be given to [Marsh] for transmittal to this Company. Proof of Loss is required as soon as practicable following the insurer's written request for signed Proof from Insured; however, Insured, at its option, may elect to file Proof with insurer prior to insurer's request.

Policy at 31 ¶ 42 (hereinafter "Notice Clause"). The Notice Clause contemplates that after receiving notice, Liberty shall have the option to require additional proof from Costco. In Washington, the notice triggers Liberty's obligation to promptly investigate the claim. WAC § 284-30-370 ("Every insurer shall complete investigation of a claim within thirty days after notification of claim, unless such investigation cannot reasonably be completed within such time."). The "Proof of Loss" that the Notice Clause identifies serves as the foundation for resolving disputes between Liberty and Costco. It permits the parties to invoke the Policy's "Arbitration Clause." Policy at 32 ¶ 47 (permitting arbitration if "the Insured and this Company shall fail to agree as to the amount of loss or damage within thirty (30) days after receipt of Proof of Loss"). It triggers additional regulatory deadlines for notifying Costco of a coverage decision. WAC § 284-30-380. It gives Liberty a basis to formally decline coverage. The Notice Clause, in short, is the only clause in the Policy that describes the beginning of the process that might lead to a "claim" on which Costco could sue.

The Notice Clause, however, places no obligation on anyone to begin the process that might lead to a claim until "the Risk Manager of the Insured has knowledge of *a loss insured by this policy*." Policy at 31 ¶ 42 (emphasis added). With one exception, the Policy does not insure losses of less than $20 million. Unlike an insurance deductible, which is a provision permitting the insurer to deduct a fixed amount from a covered claim, an excess policy does not insure claims below its limit. This distinction is inherent in the notion of excess insurance, but even if it were not, the Policy makes the distinction

explicit. Its "Deductible Clause" describes certain insured claims from which deductions are to be made, never suggesting that the Policy does not insure claims to which the deductible applies. Policy at 18-19 ¶ 8. By contrast, in a clause that describes circumstances in which the Policy becomes primary insurance, the Policy makes explicit that it does not insure losses below $20 million except in those circumstances:

> Coverage under this policy will attach to or become insurance against any peril upon property described in this policy, which at the time of any loss is insured by primary insurance has [sic] been exhausted, and then this policy shall cover only such loss as may exceed the amount due from such primary insurance.

Policy at 26 ¶ 19. In establishing special circumstances in which the Policy will insure losses below its limit, the Policy necessarily provides that other losses below its limit are not insured.

Because Costco's notice obligation depends on "knowledge" of a loss in excess of $20 million, the court interprets "inception of the loss" as the point at which Costco's Risk Manager acquires such knowledge. The court reiterates that it cannot interpret the Limitation Clause to permit the limitation period to expire before the insured is obliged to give notice. The Notice Clause, however, pins the notice obligation to "knowledge" of an insured loss, not the inception of such a loss. Thus, while "inception of the loss" standing on its own might mean the beginning of the physical loss, the remainder of the Policy demonstrates that this meaning is not intended. *See Stoughton*, 810 P.2d at 82 (noting that a court cannot apply the plain meaning of a term where the whole policy reveals a different meaning). Because the beginning of physical loss is not the "inception" referred to in the Limitation Clause, the court looks to the remainder of the Policy to find what meaning it assigns to "inception." The inception of the insured's notice obligation is the Risk Manager's acquisition of "knowledge" of a covered loss. Using this event as the "inception of the loss" generally ensures that the limitations

ORDER – 9

period will not run before the insured has a "claim" on which it can sue.[4]  The court therefore concludes that the "inception of the loss" in the Limitation Clause is the point at which the Risk Manager first has "knowledge" of a loss in excess of $20 million.

The construction of the Limitation Clause that the court adopts today, that the "inception of the loss" is the Risk Manager's first knowledge of a loss in excess of $20 million, means nothing different than the "inception of a loss compensable under the Policy," the construction the court adopted in its prior order.  Mar. 4, 2008 Ord. (Dkt. # 40) at 7.  The court adopts the new formulation because it emphasizes that knowledge of a covered loss, not the physical loss, is the triggering event for the limitations period.  It also abandons the term "compensable," because Costco has misinterpreted it.  The court used the term "compensable" in its original construction because the *Simms* court used it when construing the limitation clause before it.  *Id.* at 6-7 (quoting *Simms*, 621 P.2d at 158).  Costco has seized upon the term to insist that the court concluded that the two-year limitations period does not run until "Liberty had an actual obligation to **pay**

---

[4] So far as the court is aware, no Washington court has addressed the relationship between an insurance policy's suit limitation clause and its notice clause.  In jurisdictions outside Washington, courts and legislatures have crafted law that not only acknowledges the relationship, but regulates it to eliminate issues of policy construction like the ones before this court.  For example, an insurer can potentially frustrate an insured by delaying a determination on whether a loss is covered, exhausting all or part of a policy's suit limitation period without ever revealing whether the insured has any reason to sue.  For that reason, many jurisdictions toll a policy's suit limitation period while the insurer makes a coverage determination.  California adopted a rule in which the suit limitation period commences on the "inception of the loss," but is tolled "from the time an insured gives notice of the damage to his insurer, pursuant to applicable policy notice provisions, until coverage is denied."  *Prudential-LMI Comm. Ins. v. Superior Court (Lundberg)*, 798 P.2d 1230, 1242 (Cal. 1990).  The *Prudential-LMI* court observed that many states' courts have adopted similar tolling rules, although some have not.  *Id.* at 1238 (surveying other states' law).  Illinois has imposed tolling by statute.  215 ILCS 5/143.1 ("Whenever any policy or contract for insurance . . . contains a provision limiting the period within which the insured may bring suit, the running of such period is tolled from the date proof of loss is filed, in whatever form is required by the policy, until the date the claim is denied in whole or in part.").  Washington, however, has not created a tolling rule either by common law or by statute.  Indeed, one court in this District has concluded that Washington law does not support automatic tolling under these circumstances.  *N. Coast Enters. v. St. Paul Fire & Marine Ins. Co.*, No. C05-653L, 2006 U.S. Dist. LEXIS 8694, at *9-10 (W.D. Wash. Feb. 16, 2006).

ORDER – 10

1  Costco." Costco Mot. at 10 (emphasis in original).[5]  This construction is at odds with the

2  plain language of the Notice Clause, which establishes that notice must precede the

3  determination of what Liberty must pay.  Indeed, notice commences the process of

4  determining what Liberty must pay.  When the *Simms* court used the term

5  "compensable," it used it as a synonym for "insured," not as a requirement that a claim

6  had ripened into a payable obligation of the insurer.  621 P.2d at 158.

7          **3.**      **"Knowledge" in the Notice Clause Means Costco's Risk Manager's**

                  **Subjective Knowledge of a Loss in Excess of $20 Million, Not Merely**

8                    **the Possibility of Such a Loss.**

9          Only one interpretation issue remains.  Costco's notice obligation and the

10  "inception" of a loss depend not only on a loss in excess of $20 million, but on Costco's

11  Risk Manager's "knowledge" of that loss.  The parties do not agree on what constitutes

12  "knowledge."  Liberty expresses several interpretations.  Many times it asserts that

13  knowledge of the mere possibility that the loss would exceed $20 million is "knowledge."

14  Liberty Mot. at 19 ("the only reasonable interpretation of inception would be when

15  Costco knew the loss would be potentially recoverable under the policy"); *see also id.* at

16  7 (focusing on knowledge that the "loss could pierce the excess layer"), at 14 (noting that

17  Costco's June 1998 notice letter admitted that the loss "might affect" Liberty's layer of

18  insurance).  Other times it asserts that a higher degree of certainty is necessary for

19  "knowledge."  *Id.* at 10 (focusing on Costco's knowledge that the loss "would inevitably

20  exceed the primary layer"), at 17 ("by 2003 it was clear the claimed loss was one which

21  would be compensable under the Liberty Mutual Policy").  Sometimes Liberty attempts

22  to impose an objective standard for Costco's knowledge.  *Id.* at 16 (positing that the

---

[5] Costco reaches the same conclusion when it points to a clause in the Policy that permits Liberty
to make partial payments on claims.  Policy at 33 ¶ 48.  The clause applies "[i]n the event of a
loss covered by this policy," and permits partial payments where Costco submits only partial
payment of loss.  Costco mistakenly contends that the clause equates "a loss covered by this
policy" with "a loss actually payable" under the policy.  Costco. Mot. at 11 (emphasis removed).
The clause merely notes that Costco "may" make partial payments for losses that are ongoing.

ORDER – 11

inception of a loss is "when Costco knew or reasonably should have known the claim would inevitably exceed the primary insurance layer").

The problem with the various interpretations of "knowledge" that Costco imposes is that they are neither explicit nor implicit in the Policy itself. The court notes that other insurers include policy provisions that explicitly describe the knowledge that triggers an insured's obligations. One of those insurers is Liberty itself. Liberty apparently issues some policies that require an insured to give notice of "every loss, damage or occurrence which may give rise to a claim under this policy." This requirement is found in Liberty's three-page "CONDITIONS" form between the Policy's cover page and the text of the Policy. There is no dispute that these "CONDITIONS" are not part of the Policy. *See* Policy Cover Page (making only "GPF 524" and "Policy Manuscript Pages 1 Thru 35" part of the Policy). Nonetheless, the existence of the conditions shows that Liberty knew how to draft a notice provision that required Costco to provide notice as soon as it was aware of the *possibility* of a claim in excess of $20 million. Other insurers similarly draft policies that clarify the insured's duty to give notice. *E.g.*, *CSX Transp., Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478, 479 n.2 (D.C. Cir. 1996) (reciting clauses requiring notice "upon knowledge of any occurrence likely to give rise to a claim," and upon "knowledge of any occurrence or event in which the indemnity is or probably will be concerned"); *Lumbermens Mut. Cas. Co. v. Plantation Pipeline Co.*, 447 S.E.2d 89, 90-91 (Ga. Ct. App. 1994) (reciting clause requiring notice "whenever it appears that an occurrence is likely to involve indemnity under this policy").

The Policy before the court, however, has no language clarifying what quantum of "knowledge" is sufficient to trigger Costco's Risk Manager's notice obligation. Under Washington law, that omission is significant. In *James F. O'Connell & Assocs. v. Transamerica Indem. Co.*, 809 P.2d 231, 233 (Wash. Ct. App. 1991), the court considered a malpractice insurance policy that covered losses prior to the policy period as long as the insured had no "knowledge of any act, error, omission or personal injury

ORDER – 12

which could reasonably be expected to result in a claim." Noting that the term "knowledge" was unmodified, the court concluded that it required "actual knowledge." *Id.* at 234. It followed *Gibraltar Cas. Co. v. A. Epstein & Sons, Int'l, Inc.*, 562 N.E.2d 1039, 1045 (Ill. Ct. App. 1990), in which the court interpreted a clause excluding coverage "for claims of which [the insured] had prior knowledge." The *O'Connell* court adopted the *Gibraltar* court's reasoning that because the policy did not modify "knowledge," it required "actual knowledge of a claim, not just a reasonable expectation of a claim." *O'Connell*, 809 P.2d at 234. Whereas the insurer in *O'Connell* included a second term clarifying that it would not cover pre-policy incidents that "could reasonably be expected to result in a claim," *id.* at 234, the Policy contains no such provision imposing a reasonable expectation standard on Costco.

Applying *O'Connell* to the Policy, the court construes "knowledge" in the Policy to require actual, subjective knowledge of Costco's Risk Manager that a covered loss has occurred or will occur, not merely the possibility of a covered loss. The Policy does not modify "knowledge," and thus an actual knowledge standard applies, rather than a reasonable expectation standard. The Policy does not suggest that objective knowledge (what someone knew or reasonably should have known) matters, because it vests all responsibility for "knowledge" in Costco's Risk Manager without defining that responsibility. The court therefore concludes that the Risk Manager's subjective knowledge is determinative.

The court therefore interprets the Limitation Clause as follows: the "inception of the loss" that triggers the two-year limitations period is Costco's Risk Manager's actual, subjective knowledge that a loss in excess of $20 million has occurred or will occur. Where the Risk Manager is subjectively uncertain about whether a loss is or will be covered, he or she does not have the requisite knowledge.

ORDER – 13

### 4. Although the Policy Language is Sufficient to Determine the Construction of the Limitation Clause, Liberty's Construction Would Mandate Unripe Suits.

Before leaving behind questions of policy interpretation, the court notes that its March 2008 order raised another concern about Liberty's favored interpretation of the Limitation Clause. Tying the "inception of the loss" to the beginning of a physical loss would have had the effect, in this action, of mandating that Costco bring an unripe lawsuit to preserve its claim. The court has construed the Limitation Clause solely by reference to the Policy itself. Nonetheless, as a potential independent basis for its decision, it elaborates on its concern that Liberty's interpretation of the Policy improperly implicates courts in matters beyond their jurisdiction.

The Constitution's mandate to the federal courts in Article III, Section Two, is to resolve only "cases or controversies." In Liberty's view, Costco was obligated to sue it in 1999. As the court will discuss in Part III.B, *infra*, the undisputed evidence shows that Liberty had not denied or granted coverage for the loss in 1999, and Costco knew of nothing more than the remote possibility of a loss that would implicate the Liberty Policy. As the court noted in the prior order, this court would have dismissed such a lawsuit for lack of subject matter jurisdiction. A federal court cannot resolve a suit about a controversy the parties might have at some point in the future, depending on the evolution of an ongoing loss. Liberty would nonetheless mandate that Costco have filed such a suit.

Whereas most provisions of an insurance policy govern the relationship between the insurer and its insured, suit limitations clauses add a court to the mix. Often, as the adage goes, three is a crowd. Courts resolve controversies, and lawsuits brought solely to satisfy a suit limitation clause would seem present no controversy whatsoever. The California Supreme Court in *Prudential-LMI* adopted a tolling rule that guaranteed that a suit limitation clause would not compel an insured to come to court solely to satisfy a suit limitation clause. 798 P.2d at 1238 (noting the "seemingly anomalous conclusion" that in

ORDER – 14

some circumstances "an insured must file a lawsuit before the insurer has completed its investigation and denied the claim"). Washington courts have not addressed this issue.

These concerns are not academic, they permeate the dispute between Costco and Liberty. Costco notified Liberty about the situation at the warehouse in 1998. So far as the record reveals, Liberty never notified Costco about whether it would or would not cover Costco's losses. The court assumes that both Liberty and Costco believed at the time that Costco's losses would never reach $20 million. Costco, for its part, had little incentive to pester Liberty for a coverage determination because it did not believe that its losses would implicate the Policy. For some time, there was no controversy between the parties, both because Liberty had not declined coverage, and because a claim for coverage seemed unlikely. Yet Liberty insists that Costco should have sued in 1999. It is difficult to imagine what Costco would have pleaded in such a suit. Costco would have alleged that the parties had no dispute, and that it was suing only because a suit was necessary to preserve the possibility to sue should a dispute ever arise. Ideally, of course, the parties would have communicated and reached an agreement preserving Costco's right to sue until an actual dispute arose. The Policy does not mandate this approach, however, and the parties did not take that approach in this case. This leaves the court with Liberty's insistence that Costco should have filed a suit that presented no ripe claim.

In *Simms*, the only Washington authority of which the court is aware that interprets a suit limitation clause, the court had no occasion to consider these concerns. Nonetheless, the *Simms* decision appears to foreclose two obvious means of dealing with them. It held that the "inception of the loss" is not when an insured's cause of action against the insurer accrues, which is typically when the insurer declines coverage. *Simms*, 621 P.2d at 156-57. It also declined to make an insurer's right to enforce a suit limitation clause contingent on a demonstration of actual prejudice, as Washington courts have required of insurers who attempt to enforce a notice clause. *Id.* at 157-58.

ORDER – 15

In this case, the Policy's Notice Clause compels an interpretation of the Limitation Clause under which Costco is not compelled to bring an unripe dispute to court. A policy without such a clause would have forced the court to decide whether a policy may validly condition insurance on an insured bringing a non-controversy to court. The court expects that a Washington court confronted with such a situation would find such a condition improper.

**B.     The Evidence Reveals Disputed Issues of Material Fact About When Costco's Risk Manager First Had "Knowledge" of a Loss in Excess of $20 Million.**

Having interpreted the Policy, the court now turns to the factual question that the motions present: did Costco's Risk Manager have actual, subjective knowledge of a loss in excess of $20 million more than two years before July 10, 2006? The court concludes that the answer to this question depends on the resolution of disputed issues of material fact, and thus the court cannot answer it as a matter of law.

The evidence establishes that, as a matter of law, the inception of the loss at the warehouse did not occur from 1997 to 1998. Liberty contends otherwise, but its evidence wholly fails to establish that Janice Chamberlain, who was Costco's Risk Manager during the time period, knew of a loss that exceeded or would exceed $20 million.

Liberty makes far too much of Costco's decision to notify its insurers, including Liberty, about the loss in 1997 and 1998. According to Liberty, Costco's decision to notify Liberty is evidence that Costco's notice obligation had been triggered. Liberty does not explain this contention. Liberty does not argue that Costco's decision not to sue Liberty earlier is evidence that Costco did not have an obligation to sue, yet that conclusion follows just as naturally from Liberty's logic. The evidence suggests that Costco's reason for notifying Liberty in 1998 was an abundance of caution on both its behalf and on behalf of representatives at Marsh. Even if the evidence suggested that Costco at least believed that its notice obligation had been triggered, Costco's belief is not relevant. What is relevant is what Ms. Chamberlain knew about losses at the

ORDER – 16

warehouse from 1997 to 1998. There is no evidence from which a reasonable jury could conclude that Ms. Chamberlain (or anyone else) knew of anything more than a slim possibility of a loss that would exceed $20 million. Costco's loss therefore did not "incept" in 1997 or 1998.

The evidence is much more muddled, however, as to Costco's Risk Manager's knowledge beginning in early 2003. Sometime near April 2003, Ms. Chamberlain saw a draft of an architect's report laying out numerous options for finishing repairs at the warehouse. One of those options had an estimated cost of approximately $19.98 million. Russell Hazzard, the person whom Costco designated under Fed. R. Civ. P. 30(b)(6) as the person most knowledgeable about the loss at the warehouse, offered conflicting testimony about which options Costco chose from that report. He first testified that it had chosen the $19.98 million option, and then after speaking with counsel at a deposition break, changed his testimony to state that Costco had chosen a hybrid of that option and a cheaper option. A May 2003 draft of the same report, moreover, revised the cost of the $19.98 million option up to approximately $20.6 million. Ms. Chamberlain offers conflicting evidence about whether she ever saw the report. She appeared to acknowledge at her deposition that she saw it in 2003, but then stated in a later declaration that she does not believe she ever saw it except in connection with this litigation. The court suggests no impropriety in Mr. Hazzard's or Ms. Chamberlain's testimony. Nonetheless, a jury must resolve the discrepancies, not the court.

The evidence is also muddled regarding who was Costco's Risk Manager beginning in 2003. Ms. Chamberlain remained the head of Costco's risk management department, but admits that her subordinate, Bob Carlson, had primary responsibility for addressing the warehouse loss beginning in 2002. The evidence shows that in the wake of the early 2003 reports on estimated future repair costs, Mr. Carlson was involved in numerous communications directing that excess insurers (including Liberty) be given notice. Again, the fact that Mr. Carlson believed notice was necessary is not particularly

ORDER – 17

probative, but the fact that there was a flurry of notification activity in the wake of the 2003 reports suggests a triable issue over what information he had acquired. Moreover, Mr. Carlson's substantial involvement in assessing the loss means that there is at least an issue of fact regarding whether he should be deemed the "Risk Manager" for that period, or whether his knowledge should be imputed to Ms. Chamberlain. Nothing in this order should be read to suggest that Costco could avoid its obligations under the Policy by artificially limiting Ms. Chamberlain's access to relevant information about the loss.

Although Liberty's evidence suggests that Costco's Risk Manager may have had "knowledge" of a covered loss before July 10, 2004, Costco's evidence is more than sufficient to establish a triable issue. Costco offers evidence that the estimates set forth in the 2003 reports cannot be taken at face value. There is evidence that some of that cost was for repair or construction for which Costco did not intend to seek insurance coverage. There is evidence that Costco believed that certain costly repairs would be performed on a much smaller portion of the warehouse than suggested in the estimate. There is evidence that Costco believed, based on the cost of repairs already performed, that the estimate was excessive. There is evidence that by the end of 2003, Costco's repair costs were approximately $13 million, and that it did not expect those costs to increase substantially. According to Costco, it was the December 2005 discovery that the repairs were inadequate, coupled with a new report from its architects in July 2006 addressing the issue, that gave Ms. Chamberlain "knowledge" that repair costs would exceed $20 million.

Because the evidence is insufficient to establish as a matter of law whether Costco timely sued, the court must address two other arguments that the parties raise to dispose of this action.

## C. Costco's Loss Undisputedly Occurred During the Policy Period.

The court rejects Liberty's contention that if the "inception of the loss" for which Costco seeks coverage did not occur within the 1997-1998 period of the Policy, then the

ORDER – 18

Policy does not cover the loss. Liberty insists that this is the natural consequence of the construction of "inception of the loss," but it is mistaken. The court has held that the Notice Clause and Limitation Clause look to "knowledge" of a loss in excess of $20 million as a triggering event. The same is not true, however, of the coverage provisions of the Policy, which unmistakably look for a physical loss that occurs during the Policy period. Liberty does not attempt to argue otherwise. Costco seeks recovery for a physical loss that occurred during the Policy period, but whose "inception" occurred outside the Policy period.

**D.    Costco's Suit Against Three Other Insurers Does Not Relieve It of Its Obligation to Sue Liberty.**

Costco did not sue Liberty until 2006, but it sued Swiss Re, Commonwealth, and Zurich-American in October 1998. Costco offers a two-pronged argument that this lawsuit satisfied its obligation to timely sue Liberty.

First, Costco argues that a suit against any of the insurers in its multi-layered 1997-1998 insurance program should satisfy the Limitation Clause as to any insurer in the program. The court need not dwell on this argument. Although the court has queried whether Costco can be deemed the "drafter" of the Policy or of any individual policy in the insurance program (*see supra* Part III.A.1), Costco was unquestionably the architect of the program itself. For example, it designated Marsh as the common notice agent for all (or virtually all) insurers in the program. It did not, however, establish either in any of the policies or in any other agreement that a suit against one insurer would satisfy the suit limitation clause against all insurers. Its failure to do so when it created the program is fatal to its attempt to do so now.

Second, Costco argues that res judicata supports a determination that its suit against the other three insurers means that the Limitation Clause does not apply in this lawsuit. Costco observes that the prior litigation ended with a judgment on the merits that included a declaratory judgment that the insurers involved were liable for future

ORDER – 19

repair costs at the site, subject to the limits of their policies. Costco reasons that if that judgment binds Liberty, then the current lawsuit is not subject to the Limitation Clause, because it is a suit to enforce the prior judgment, and not a suit "on the policy" as the Limitation Clause requires. Costco's application of res judicata principles is creative, but ultimately unavailing.

Costco's effort to invoke res judicata fails because the prior judgment was not against Liberty or anyone in privity with Liberty. Res judicata permits a prior judgment to dispose of a later lawsuit only when "the earlier suit . . . (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002). Because Costco's prior litigation did not involve Liberty, it is incumbent on Costco to show that Liberty was in privity with at least one of the three insurers involved in the prior litigation. To do so, Costco must show that one of the insurers had an "identity of relevant interests" with Liberty, and that Liberty's interests were adequately represented in the prior suit. *Irwin v. Mascott*, 370 F.3d 924, 929 (9th Cir. 2004). But this is manifestly not the case. As this litigation amply demonstrates, one of Liberty's primary legal interests was in enforcing the Limitation Clause and requiring Costco to timely sue. None of the insurers in the prior litigation shared this interest, because there was no dispute that Costco timely sued them. Costco cannot invoke res judicata for at least that reason.

## IV. CONCLUSION

For the reasons stated above, the court DENIES both parties' motions for summary judgment (Dkt. ## 52, 53). Because Costco has not prevailed in this action, the court need not address Costco's request for attorney fees.

In accordance with the court's July 2, 2008 order (Dkt. # 44) the court sets a June 22, 2009 trial solely to determine whether Costco timely sued. The parties shall submit motions in limine no later than June 1, and note them for consideration on June 12. Trial

ORDER – 20

briefs, proposed voir dire, and proposed jury instructions shall are due on June 12. The court will hold a pretrial conference on June 16, 2009 at 1:30 p.m.

DATED this 30th day of April, 2009.


The Honorable Richard A. Jones
United States District Judge

ORDER – 21